**2026 UT App 123**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTHONY DOMINIC RENDON,
Appellant.

Opinion
No. 20240269-CA
Filed August 6, 2026

Third District Court, Salt Lake Department
The Honorable Kara Pettit
No. 211906771

Freyja Johnson and Rachel Phillips Ainscough,
Attorneys for Appellant

Derek E. Brown and Aubrey Bisbee,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 Anthony Dominic Rendon and his friends arrived at a house party as it was ending. Things quickly went south when his friend got into a fight with another partygoer. After a series of events, Rendon fired thirteen shots from the back seat of his friend's car, and one of the bullets struck and killed that same partygoer. Rendon was convicted of murder and eleven counts of felony discharge of a firearm. He appeals, raising several arguments related to the justification defense he pursued at trial. We affirm.

## BACKGROUND[1]

¶2 One night in June 2021, a group of renters threw a housewarming party. As the party was ending, Rendon showed up with his friends, Andrew, Curtis, and Tyler, even though the group did not know most of the other partygoers.[2] After Rendon's group arrived, Andrew got into an argument with Will, who was leaving the party with some friends. The argument escalated into a physical altercation, which prompted Rendon and other partygoers to intervene and try to pull the two apart. Andrew then swung at Will, missed, and inadvertently struck Christina, who was also trying to break up the fight. Andrew and Will were eventually pulled apart, after which Rendon and his friends got into Andrew's car and drove away.

¶3 After Rendon's group left, Will and his friends became indignant when they learned that Andrew had punched Christina. Rendon and his friends were apparently also angry. Indeed, Rendon and Andrew "yell[ed]" at Curtis, who was driving, to "go back" to the party so Andrew could "get" Will. Curtis then made a U-turn, and the group returned about a minute after leaving. Upon arriving, Rendon and his friends got out of the car, and Andrew darted "straight to" Will. Will "body-slammed" Andrew, and the two continued fighting on the ground. Andrew then got up, staggered back to the car, and got

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Barlow*, 2025 UT App 152, n.2, 579 P.3d 422 (cleaned up).

2. We use pseudonyms when referring to individuals other than Rendon in this opinion.

into the driver seat. Rendon got into the rear seat on the driver side.

¶4     By this time, a large—and clearly angry—crowd had gathered near the passenger side and the rear of the car and started attacking it.[3] One partygoer picked up a maintenance hole cover and headed toward the car. Andrew started to drive away but realized that Curtis wasn't in the car. He stopped, and Curtis got in, at which point considerable space had developed between the car and the crowd, with nothing in front of the car preventing the group from driving away. Nonetheless, Rendon drew a handgun, rolled his window down, and fired thirteen shots in rapid succession. The group then drove away. Will "wasn't even close to the car" when Rendon fired the rounds, but one of the bullets struck him in the chest. He then took a few steps before collapsing and dying.

¶5     Someone called the police, and witnesses identified Rendon as the shooter. He was arrested and charged with one count of murder and twelve counts of felony discharge of a firearm, presumably one for each of the bullets he fired that didn't strike anyone.

¶6     At trial, the State's witnesses testified consistently with the above. The State also elicited evidence that none of the partygoers aside from Rendon was seen armed with "a gun, a knife, [or] a weapon of any sort." Moreover, the State also admitted video footage of the incident, which had been captured by a surveillance camera across the street. After the State rested, Rendon moved for

---

3. Rendon claims that the car had been "surrounded" at this point. To the extent he suggests that partygoers were gathered on all sides of the car, the surveillance footage admitted at trial plainly belies the claim. While the footage shows one partygoer on the driver side of the car, the rest of the crowd is near the passenger side and the rear of the car.

a directed verdict, arguing that the prosecution had not presented enough evidence to disprove beyond a reasonable doubt that he acted in self-defense, in defense of others, or to prevent a forcible felony when he fired the thirteen shots. The court denied the motion.

¶7      For his part, Rendon elected not to testify but called several witnesses, including Andrew, during his case in chief. Andrew testified that he had sustained a concussion in his fight with Will. Notably, none of the witnesses testified that Rendon or anyone in his group actually saw the partygoer who had picked up the maintenance hole cover and headed toward the car.

¶8      After the close of evidence, the trial court instructed the jury on both perfect and imperfect defense of self and others. Over Rendon's objection, however, the court also instructed the jury that "[t]he defendant is not justified in using force if the defendant . . . [w]as the aggressor or was engaged in a combat by agreement, unless the defendant withdraws from the encounter and effectively communicates to the other person the defendant's intent to do so and, notwithstanding, the other person continues or threatens to continue the use of unlawful force."

¶9      The court also instructed the jury as follows:

> When the lawyers give their closing arguments, keep in mind that they are advocating their views of the case. What they say during their closing arguments is not evidence. If the lawyers say anything about the evidence that conflicts with what you remember, you are to rely on your memory of the evidence. If they say anything about the law that conflicts with these instructions, you are to rely on these instructions.

¶10     In closing argument, the prosecutor maintained that Rendon's use of lethal force was not justified because it was

neither "necessary" nor "reasonable" under the circumstances. To this end, the prosecutor emphasized the evidence that Will and others in the crowd were unarmed, that there was considerable space between the crowd and the car when the shots were fired, and that Rendon's group was shielded by the "steel and glass" of Andrew's car.

¶11    In his closing, Rendon conceded that he was the shooter and focused instead on a justification theory. He pointed to evidence that an angry mob attacked the car and that one partygoer "charge[d]" toward the car with the maintenance hole cover. Rendon argued that for these reasons he "fired his gun not intending to kill, not intending to hurt, but trying to get that crowd to move away." Rendon also claimed that it was Andrew, not him, who had started the fight, so he had the right to use "defensive force to protect [Andrew] or the other people in that car."

¶12    In the State's rebuttal, the prosecutor argued again that Rendon's conduct was "unnecessary and unreasonable." The prosecutor acknowledged Rendon's argument that it was Andrew who had started the fight. But he argued that the distinction, even if true, didn't make a difference because "[y]ou don't get to defend another person who was an aggressor." The prosecutor then refuted the notion that Rendon was not an initial aggressor by citing the evidence that he and Andrew had told Curtis to "go back" to the party.

¶13    The case was then submitted to the jury. After the jury left to deliberate, Rendon claimed that the prosecutor misstated the law when he argued that one cannot defend an initial aggressor, and he requested a curative instruction to address the issue. After hearing argument on the issue from the parties, the court stated, "I'll look at it and let you know if I think a curative . . . instruction is warranted." The court did not formally rule on the issue, and the jury did not receive a curative instruction.

¶14    The jury convicted Rendon as charged, with the exception of one of the felony discharge counts, which the State had dismissed. Rendon later moved both to arrest judgment and for a new trial. For the first motion, he asked that the court enter either a judgment of acquittal or a conviction of manslaughter because the evidence showed that his "use of force was justified in response to the commission or attempted commission of forcible felonies." For the second motion, Rendon argued that "the jury was improperly instructed about whether an individual may act in defense of another who was an initial aggressor." For this reason, he asserted that "[t]he inclusion of this language . . . invited the jury to disregard [his] claim of defense of self or others on an improper basis." Rendon concluded by arguing that "[t]he heart of this case was a claim of defense of self or others" and that the alleged error was "substantive and significant" and therefore needed to be "corrected" by granting a new trial. The court denied both motions, concluding that (1) there was sufficient evidence to support the jury's verdict and (2) the contested jury instruction correctly stated the law.

¶15    Rendon appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    Rendon raises three issues for our review. First, he maintains that the trial court should have granted his motion to arrest judgment because the State did not disprove that his use of force was justified. We review a court's denial of a motion to arrest judgment for correctness. *State v. Miller*, 2023 UT 3, ¶ 50, 527 P.3d 1087.

¶17    Second, Rendon argues that the jury was incorrectly instructed on justification under the circumstances of this case and that the court should have granted his motion for a new trial. "When the district court denies a motion to arrest judgment and for a new trial, we review that decision for an abuse of discretion,

but we review the legal standards applied by the district court in denying such a motion for correctness." *State v. Newton*, 2018 UT App 194, ¶ 18, 437 P.3d 429 (cleaned up), *aff'd*, 2020 UT 24, 466 P.3d 135; *see also State v. Archuleta*, 2021 UT App 66, ¶ 15, 492 P.3d 801 ("We review challenges to jury instructions under a correctness standard." (cleaned up)).

¶18    Lastly, Rendon asserts that the court erred when it effectively denied his request to give a curative instruction to the jury based on the prosecutor's statement that "[y]ou don't get to defend another person who was an aggressor." "We review a district court's refusal to give a jury instruction for abuse of discretion." *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208. Nonetheless, in certain circumstances, the court's discretion in this realm is "strictly cabined." *Id.*

ANALYSIS

I. Motion to Arrest Judgment

¶19    Rendon asserts first that the trial court should have granted his motion to arrest judgment because the State failed to disprove beyond a reasonable doubt that he was justified in using lethal force under the facts of this case. We are unpersuaded by Rendon's argument.

¶20    Rule 23 of the Utah Rules of Criminal Procedure provides, as relevant here, that "[a]t any time prior to the imposition of sentence, the court . . . upon motion of a defendant shall . . . arrest judgment if the facts proved or admitted do not constitute a public offense." Where, as here, a party raises a sufficiency of the evidence argument in connection with a motion to arrest judgment, we will uphold the trial court's denial of the motion "if some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Miller*, 2023 UT 3, ¶ 50, 527 P.3d 1087 (cleaned up).

Stated otherwise, we will reverse a trial court's "denial of a motion to arrest judgment only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Id.* (cleaned up).

¶21 Under the justification statute, "[a]n individual is justified in using force intended or likely to cause death or serious bodily injury only if the individual reasonably believes that force is necessary to prevent death or serious bodily injury to the individual or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony." Utah Code § 76-2-402(2)(b). Relying on the statute, Rendon makes three arguments that the court should have arrested judgment based on his justification defense. First, he claims that the "undisputed evidence" established that he acted "to prevent death or serious bodily injury to himself and others." Next, he again refers to "undisputed evidence" in asserting that he acted "to prevent an aggravated assault, riot, or vehicular burglary." Finally, he argues that the "undisputed imminence of danger and reasonableness of [his] actions demonstrated that he acted in self-defense."

¶22 Rendon's arguments are easily dispensed with because the evidence is simply not so inconclusive that reasonable minds *must* have entertained a reasonable doubt on his justification argument. Most obviously, Rendon fired thirteen shots when there was considerable space between Andrew's car and the crowd, and there was nothing in front of the car to prevent Andrew from driving away. Further, there was no testimony that Rendon or any of his friends saw the partygoer with the maintenance hole cover who was heading toward the car. Nor was there evidence that anyone else in the crowd was armed or that anyone in Rendon's group believed that someone was armed.

¶23     There is also evidence to support a finding beyond a reasonable doubt that the threat—if any—of a forcible felony had abated by the time Rendon fired the shots. Again, Andrew had pulled the car away from the crowd and created considerable space between the crowd and the car, and there was no evidence that the car's occupants knew about the partygoer who was headed toward the car with the maintenance hole cover. *See id.* § 76-2-402(2)(b) (requiring that the defendant *believe* that the circumstances necessitate the use of lethal force).

¶24     Under these circumstances, the evidence supported a finding beyond a reasonable doubt that Rendon's conduct was motivated by a desire for revenge, or "retaliation," which constitutes "illegal force used too late." *See State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 (cleaned up). Indeed, there was evidence that Andrew and Rendon wanted to "go back" so Andrew could "get" Will. And, of course, the only person who was actually shot was Will—the person who apparently prevailed in the second fight when he "body-slammed" Andrew and gave him a concussion and who was not standing close to the car at the time Rendon fired the shots.

¶25     From this evidence, a reasonable jury could have found beyond a reasonable doubt that the justification defense did not apply. Consequently, Rendon's first argument falls short.

## II. Motion for a New Trial

¶26     Rendon argues next that the trial court erred in denying his motion for a new trial because the jury should not have been instructed on the initial aggressor provision of the justification statute. Because there was sufficient evidence to support a finding that Rendon was an initial aggressor in this case, we are unpersuaded by his argument on this point.

¶27     Under rule 24 of the Utah Rules of Criminal Procedure, "[t]he court may . . . grant a new trial in the interest of justice if

there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a). We will not reverse a trial court's denial of a motion for a new trial "absent a clear abuse of discretion by the trial court." *State v. Boyer*, 2020 UT App 23, ¶ 18, 460 P.3d 569 (cleaned up). In other words, we will assume that the court "exercised proper discretion unless the record clearly shows the contrary." *State v. Serrano*, 2019 UT App 32, ¶ 8, 440 P.3d 734 (cleaned up).

¶28 The justification statute provides in relevant part as follows: "An individual is not justified in using force . . . if the individual . . . was the aggressor." Utah Code § 76-2-402(3)(a)(iii). The challenged instruction tracked the statute. Although Rendon does not contend that the instruction misstated the law, he maintains it was incorrect as applied to his "defense under the facts of the case" because he was not the "initial aggressor." He asserts that the "undisputed evidence" established he was not the aggressor because he "twice attempted to end the fights" between Will and Andrew.

¶29 We are not persuaded. "An aggressor is one who willingly and knowingly initially provokes a combat or *does acts of such a nature as would ordinarily lead to combat*." *State v. Schoenfeld*, 545 P.2d 193, 196 (Utah 1976) (emphasis added). Here, there was competent evidence that Rendon yelled at Curtis after they originally left the party to turn around and "go back" to the scene where Andrew had just gotten into a fight with Will and that Andrew said he wanted to "get" Will.[4] A reasonable inference

---

4. Rendon tries to mitigate the significance of having "yell[ed]" at Curtis to "go back" to the scene by arguing that the investigating detective "corrected" himself on the stand and said that it was Andrew "who said, 'let me get him.'" Based on our review of the record, this was no correction or clarification. On direct examination, the detective testified that Curtis had told him that

(continued…)

from this evidence is that Rendon clearly knew that Andrew was looking for another fight with Will and, to facilitate the renewed confrontation, actively prodded Curtis to return to the scene. Against this backdrop, a reasonable jury could well have found that Rendon's conduct was "of such a nature as would ordinarily lead to combat." *See id.*; *see also id.* at 195–96 (concluding that the defendant was an aggressor when, among other things, "he knew he was going into a continuation of hostility" that had ended earlier in the night). Consequently, there was evidence to support instructing the jury on the initial aggressor provision of the justification statute.

¶30     For these reasons, the trial court did not abuse its discretion in denying the motion for a new trial. Rendon's second argument therefore misses the mark.

### III. Failure to Provide Curative Instruction

¶31     Lastly, Rendon argues that the prosecutor misstated the law in closing argument and therefore asserts that the trial court erred in effectively denying his request for a curative instruction. Here, we address this argument by assuming, without deciding, that the trial court abused its discretion. Even with this assumption, however, Rendon cannot establish that he was harmed by the presumed error on the facts of this case.

¶32     Rendon points to the plain language of the justification statute to argue that the prosecutor plainly misstated the law when he argued that "[y]ou don't get to defend another person who was an aggressor." The relevant provision of the statute

---

both Rendon and Andrew "yell[ed]" at him to "go back" to the scene. And then right before the detective's supposed clarification on cross-examination, he specifically reiterated that Rendon and Andrew both told Curtis to "go back." Therefore, Rendon's attempt to downplay the significance of the detective's testimony is unpersuasive.

provides that "[a]n individual is not justified in using force . . . if the individual . . . was the aggressor or was engaged in a combat by agreement, *unless* the individual withdraws from the encounter and effectively communicates to the other individual the intent to withdraw from the encounter and, notwithstanding, the other individual continues or threatens to continue the use of unlawful force." Utah Code § 76-2-402(3)(a)(iii) (emphasis added). Setting aside the fact that we've already concluded that there was evidence from which the jury could have found beyond a reasonable doubt that Rendon was the aggressor, he does have a point regarding the overbreadth of the prosecutor's statement. Indeed, as suggested by our emphasis above, the plain language of the provision does contemplate that one *can* use deadly force to protect an initial aggressor in limited circumstances. *See id.*; *see also Ray v. Wal-Mart Stores, Inc.*, 2015 UT 83, ¶ 40, 359 P.3d 614 ("An actor is privileged to defend a third person from harm under the same conditions and by the same means as those under which he is privileged to defend himself." (cleaned up)).

¶33 Based on the above, we assume without deciding that the trial court's failure to give a curative instruction to the jury on the prosecutor's overly broad statement constituted an abuse of discretion. That said, Rendon must demonstrate harm to be entitled to reversal because a court's failure to give a "requested jury instruction[] constitutes reversible error only if [its] omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Kitzmiller*, 2021 UT App 87, ¶ 29, 493 P.3d 1159 (cleaned up). "An error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (cleaned up). And "[e]rrors are often harmless where there is overwhelming evidence in the record of the defendant's guilt." *Id.*

¶34 The evidence that Rendon's conduct was not justified was simply overwhelming. As we emphasized in Part I, Rendon fired his handgun thirteen times when there was considerable space between the car and the crowd, and the only person who was struck was the partygoer who had just body-slammed Andrew. Moreover, there was nothing preventing Andrew from pressing on the accelerator and driving the group away from the scene, as Curtis had done just a few minutes earlier. And Rendon did not elicit evidence that he or any of his friends saw the partygoer who headed to the car with the maintenance hole cover. There likewise was no evidence that anyone else in the crowd was armed or, more importantly, that anyone in Rendon's group believed that someone was armed. *See* Utah Code § 76-2-402(2)(b) (requiring the defendant to have a reasonable *belief* that lethal force is necessary under the circumstances). And there is plenty of evidence that any threat of a forcible felony had receded by the time Rendon fired the thirteen rounds. Andrew had pulled the car forward, and nobody in the crowd continued attacking it at this point. *See id.*

¶35 In short, the evidence overwhelmingly demonstrated that Rendon appeared motivated by a desire for revenge, or "retaliation," *see State v. Berriel*, 2013 UT 19, ¶ 14, 299 P.3d 1133 (cleaned up), when he shot and killed Will, who was not even close to the car at the time the shots were fired. Therefore, the evidence plainly demonstrated that Rendon's use of force was "too late" and was therefore illegal. *See id.* (cleaned up); *see also id.* ¶¶ 14, 16, 19 (concluding that the defendant's stabbing of the victim was either preemptive or retaliatory where the initial threat had subsided and where the third person that the defendant was supposedly protecting was standing at least fifteen feet away from the victim, and therefore affirming the trial court's refusal to instruct the jury on defense of a third person).

¶36 Consequently, any error by the trial court in failing to give the curative instruction was harmless because the evidence

plainly demonstrated that Rendon's actions were not justified. Rendon's final argument is therefore unavailing.

## CONCLUSION

¶37   The trial court properly denied Rendon's motions for a new trial and to arrest judgment because there was enough evidence to disprove his justification defense beyond a reasonable doubt and to support the instruction regarding an initial aggressor. And although we have assumed that the court erred in failing to give a curative instruction based on the prosecutor's likely misstatement of the law in closing argument, the presumed error was harmless because the evidence of Rendon's guilt was overwhelming. We therefore affirm his convictions.